**ANTOINETTE BENNERSON, Appellant**

v.

**HENRY JOSEPH, et al., Appellees**

No. 78-1130

United States Court of Appeals

Third Circuit

Argued April 26, 1978

Filed July 3, 1978

EDWARD J. OCEAN, ESQ., Christiansted, St. Croix, V.I., *for appellant*

JEAN–ROBERT ALFRED, ESQ., Christiansted, St. Croix, V.I., *for appellees Hurchell, Greenaway & Rudolph Todman*

RICHARD H. HUNTER, ESQ. (ISHERWOOD, COLIANNI, ALKON & BARNARD), Christiansted, St. Croix, V.I., *for appellees First Pennsylvania Bank, N.A. and Elsie Jeffers Walcott*

Before GIBBONS, GARTH and HIGGINBOTHAM, *Circuit Judges*

OPINION OF THE COURT

GIBBONS, *Circuit Judge*

Antoinette Bennerson, the plaintiff-appellant, is a seventy-six year old widow. She is illiterate, having received virtually no formal education. When she was an adult, she learned to sign her own name in a labored manner. Prior to 1967 she was married to Eugene Bennerson, and they owned a substantial tract of land at Estate Whim, St. Croix, Virgin Islands. While Eugene Bennerson was still alive, the tract was subdivided, and part of it, Plot 96, was conveyed, subject to a life interest, to a tenancy in common in Antoinette Bennerson and four Bennerson chil-

dren. The remainder of the tract, which included Plots 63, 95, and 107, passed to Mrs. Bennerson's sole ownership upon her husband's death. These plots were further subdivided, and purported conveyances from each plot were recorded from time to time. In 1973 Mrs. Bennerson approached an attorney to complain that the conveyances had been made without her knowledge or authority and that she had not received the proceeds of sale. Shortly thereafter, in February, 1974, the opening act in this legal drama commenced when a complaint was filed, naming Henry Joseph as defendant and seeking (1) an accounting of monies received from the sale of lots in Plot 63, (2) a declaration that conveyances out of Plots 95 and 107 were void, and (3) such other equitable relief as might be appropriate.

Henry Joseph, who now works as a prison guard, lived in the Bennerson household in Frederiksted as a child although his mother and father lived in St. Croix. Joseph left St. Croix in 1948 but returned in 1965 when his mother died. He was then about 35 years old. He moved in with Eugene and Antoinette Bennerson, and continued to reside there until the time of his second marriage in May, 1968. Joseph was served with the original summons and complaint on February 27, 1974, but defaulted. A motion for the entry of a default was granted by the district court on July 2, 1974, and on July 30, 1974, the court held a hearing on the entry of a default judgment. Although testimony was presented in this hearing, no default judgment was entered. The testimony tended to establish that numerous conveyances had been made out of Plots 63, 95, and 107 by deeds bearing a signature "Antoinette Bennerson," but that the deeds were not signed by Mrs. Bennerson or by the witnesses who purportedly witnessed her signature. The court pointed out that full relief would require joining the grantees.

On November 10, 1975, an amended complaint was filed adding as defendants three grantees out of Plot 63,[1] nine grantees of eight lots out of Plot 107,[2] and eight grantees of seven lots out of Plot 95.[3] Thereafter Louis Soto, a sub-grantee of Lot 95-N from Jose and Carmen Figueroa, was added by amendment. Of these twenty-one added defendants the record discloses service of process directly or by substituted service on fifteen. Of those for whom no return of service appears of record an appearance and answer was filed on behalf of three. No return of service or appearance appears of record for two.[4] Of those served no appearance or answer has been filed on behalf of nine.[5] A motion for the entry of a default judgment against the defaulting defendants was filed on Mrs. Bennerson's behalf on March 29, 1977, but has never been acted upon. Henry Joseph's default has never been cured. The amended complaint thus questioned the validity of conveyances to Henry Joseph (all of Plot 63 and Lots 95-D and 95-E), of three convey-

----

[1] William Ephraim, Lot 63-R
　　Aureola Petrus, Lot 63-S
　　Philomena Bates, Lot 63-T
[2] Arnold Mathew, Lot 107-A
　　Cassandra and Patrice Paul, Lot 107-AA
　　Mary Richardson, Lot 107-E
　　Victor Christian, Lot 107-G
　　Hunchell Greenway, Lot 107-H
　　Tomas L. Rivera, Lot 107-I
　　Mildred Senthill, Lot 107-J
　　Randolph Todman, Lot 107-K
[3] Manuel Perez, Lot 95-O
　　Jose and Carmen Figueroa, Lot 95-N
　　Adams Engineering & Constr. Co., Lot 95-M
　　Prudencio Dumont, Lot 95-K
　　Thelma Roberts, Lot 95-P
　　Elsie Jeffers, Lot 95-L
　　Olric Forde, Lot 95-H
[4] William Ephraim, Lot 63-R
　　Tomas L. Rivera, Lot 107-I
[5] Aureola Petrus, Lot 63-S
　　Philomena Bates, Lot 63-T
　　Cassandra and Patrice Paul, Lot 107-AA
　　Victor Christian, Lot 107-G
　　Mildred Senthill, Lot 107-J
　　Olric Forde, Lot 95-H
　　Adams Engineering & Constr. Co., Lot 95-M
　　Prudencio Dumont, Lot 95-K

ances out of Plot 63 as to which no grantee has appeared, of eight conveyances out of Plot 107 as to which only four grantees have appeared, and of six conveyances out of Lot 95 as to which grantees of three have appeared.

On March 4, 1977, First Pennsylvania Bank, N.A., filed a motion to intervene as a defendant because it was the mortgagee of a mortgage issued by Henry Joseph and his wife on Lots 95-D and 95-E and on Lots 63-A through 63-Q of Plot 63, securing an indebtedness of $58,500. That motion was granted on March 3, 1977. Those defendants who appeared, including the intervenor mortgagee, put in issue Antoinette Bennerson's denial of the genuineness of her signature. They also pleaded, alternatively, that Joseph had acted on her behalf with her authority and had paid over to her the proceeds of sale. One defendant, Arnold Mathew, pleaded that a prior action by him to quiet title was res judicata against the plaintiff.

Meanwhile, acting ex parte and sua sponte, the district court on January 28, 1977, entered an order referring the case to a master.[6] When the case came on for a hearing before the master, Antoinette Bennerson put in evidence three deeds (Exhibits P. 1, P. 2, & P. 3) executed prior to the time of her husband's death, which she said bore her genuine signature. One of these, Exhibit P. 3, dated March 9, 1965, was acknowledged before a notary public named Amelia Peterson. She also put in evidence the following additional deeds in which her name appears as grantor, as to each of which she denied her signature:

| Date | Exhibit No. | Grantee | Witnesses | Notary | Location |
|------|-------------|---------|-----------|--------|----------|
| May 4, 1967 | P. 16 | Henry A. Joseph | Rosalia Lenhardt Louise Williams | Franz E. Delemos | Lots 95-D, 95-E |
| May 4, 1967 | P. 23 | Elsie Jeffers | Henry A. Joseph Rosalia Lenhardt | Franz R. Delemos | Lots 95-L, 95-I |

[6] That action was, for the reasons set forth at p. 31 infra, improper.

| | | | | | |
|---|---|---|---|---|---|
| Aug. 12, 1967 | P. 21 | Thelma Roberts | Henry Joseph Eleanor Phillips | Amelia P. Gill[7] | Lot 95-P |
| Nov. 27, 1967 | P. 20 | Adams Engineering & Constr. Co. | Henry A. Joseph Hubert Hendricks | Franz R. Delemos | Lot 95-M |
| March 8, 1968 | P. 4 | Henry Joseph | Rosalia Lenhardt Victor Donohue | Amelia P. Gill[7] | Plot 63 |
| Oct. 29, 1968 | P. 19 | Jose & Carmen Figueroa | Henry A. Joseph Eleanor A. Joseph[8] | Amelia P. Gill[7] | Lot 95-N |
| Oct. 1, 1969 | P. 17 | Olric Forde | Henry Joseph Eleanor A. George[8] | Amelia P. Gill[7] | Lot 95-H |
| Oct. 1, 1969 | P. 18 | Manuel Perez | Henry Joseph Eleanor A. George[8] | Amelia P. Gill[7] | Lot 95-O |
| June 30, 1970 | P. 14 | Arnold Mathew | Henry Joseph Arnold Mathew | C. L. Richards | Lot 107-A |
| June 30, 1970 | P. 12 | Mildred Senthill | Henry Joseph Arnold Mathew | C. L. Richards | Lot 107-J |
| June 30, 1970 | P. 11 | Tomas L. Rivera | Henry Joseph Arnold Mathew | C. L. Richards | Lot 107-I |
| July 27, 1970 | P. 10 | Hunchell Greenway | Henry Joseph Eleanor Joseph | C. L. Richards | Lot 107-H |
| Aug. 31, 1970 | P. 9 | Victor Christian | Henry Joseph Eleanor George[8] | C. L. Richards | Lot 107-G |
| Feb. 3, 1972 | P. 15 | Cassandra & Patrice Paul | Henry Joseph Eleanor George[8] | C. L. Richards | Lot 107-AA |
| Feb. 3, 1972 | P. 13 | Randolph Todman | Henry Joseph Eleanor George[8] | C. L. Richards | Lot 107-K |
| May 3, 1972 | P. 22 | Prudencio Dumont | Henry Joseph Eleanor George[8] | A. B. James | Lot 95-K |
| Aug. 28, 1972 | P. 8 | Mary Richardson | Henry Joseph Eleanor Joseph[8] | illegible | Lot 107-E |

On these seventeen deeds appear the purported sig-
natures of eight witnesses: Henry Joseph, Eleanor George
Joseph, Rosalia Lenhardt, Louise Williams, Hubert

---

[7] Amelia [Peterson] Gill also notarized Exhibit P. 3 referred to above.

[8] Eleanor A. Joseph and Eleanor A. George are the same person. George was Mrs. Joseph's name prior to her marriage to Joseph in May, 1968.

Hendricks, Eleanor Phillips, Victor Donohue, and Arnold Mathew. Three—Rosalie Lenhardt, Eleanor George Joseph, and Hubert Hendricks—were called by Mrs. Bennerson. They denied witnessing her signature and denied signing the documents. Four—Louise Williams, Eleanor Phillips (whose signature looks suspiciously similar to the purported signatures of Eleanor George or Eleanor Joseph), Victor Donohue, and Arnold Mathew—were not called by either the plaintiff or the defendants.[9]

Each of the seventeen deeds bore a notary public's certificate of acknowledgment. Five were notarized by Amelia Peterson Gill, who had also notarized the admittedly genuine signature on Exhibit P. 3. There is no question that the signature on P. 3 appears entirely unlike the five later signatures. Gill was not called as a witness.

A number of the deeds were notarized by Franz E. Delemos. In an effort to establish that the signatures on these were genuine the defendants called Delemos. He testified that Joseph brought him Exhibits P. 16 and P. 23 and asked him to notarize Mrs. Bennerson's signature. He then telephoned her and asked if she had signed them. She said she had, and he could notarize them. She also said, "Henry is my boy". Thereafter, without further inquiry of Mrs. Bennerson, he notarized other deeds bearing her purported signature presented to him by Henry Joseph. He did so, according to his testimony, because he was familiar with her signature on other documents at the bank where he worked and knew it to be genuine. (Tr. 292.) Delemos recalled no other instance in which he certified acknowledgments of persons who had not signed in his presence. Mrs. Bennerson denied the telephone conversation. Henry Joseph's recollection of the initial transaction with Delemos was that he did not tell Delemos Mrs. Benner-

---

[9] Henry Joseph also testified for the defendants. Reference is made hereafter to his testimony.

22

son had signed the deed, and that no call was made while he was present. (Tr. 417.)

A number of the deeds were notarized by C. L. Richards. He was called by the defendants to establish that the signatures were genuine. He testified that Henry Joseph brought him some unsigned deeds at his place of employment, a bank in Frederiksted, said he was acting for Mrs. Bennerson in selling some property, and asked if he would notarize them. Richards said, "Well, let's go to Mrs. Bennerson, at least for the first one, and see what she says." (Tr. 218.) They went to Mrs. Bennerson's home with an unsigned deed, which Mrs. Bennerson signed, Henry Joseph and his wife witnessed, and he notarized. Mrs. Bennerson, he testified, told him that Henry would be handling her affairs, and that she would like him to continue notarizing deeds. He did so, without ever seeing her sign another deed. (Tr. 219.) Mrs. Bennerson denied Richards's testimony about this visit. (Tr. 334.) The testimony that the first deed was witnessed by Henry Joseph and his wife is inconsistent with the chronology in the written record, since the three deeds Richards notarized on June 30, 1970, bear the signatures of Henry Joseph and Arnold Mathew. Ten days later, Richards returned to the stand with a different version. This time, he testified that the deeds were actually signed when Joseph first presented them, but that the visit to the house took place anyway.

And I asked him if he had any authorization to sign for her. He told me no, she was going to sign herself. So I told him to let's go up to her house since she was sick and couldn't come out and see what she would say about this.

Mrs. Bennerson did not sign the deed, she signed a sheet of paper with which I compared the signature on the deed and when I was satisfied that it matched, I notarized the document.

(Tr. 309–10.) He did not preserve the sample signature. His change in testimony was the result of checking the

23

record[10] (Tr. 309), which was not produced. Joseph did not confirm Richards's version. (Tr. 420.)

After attempting to establish, through Delemos and Richards, that Antoinette Bennerson's signatures were genuine, the defendants called Henry Joseph. He testified that all the signatures which Antoinette Bennerson challenged, including two signatures as a witness (on deeds he signed as grantee of part of Plot 63, Exhibits P. 5 and P. 7) were signed by him! Thus the testimony of the notaries public that some at least of the signatures were made or acknowledged as genuine in their presence was entirely discredited. Every notarial certificate of acknowledgment by Antoinette Bennerson was unequivocally established to be false. The defendants no longer contend otherwise.

Henry Joseph contended, however, that while he signed Antoinette Bennerson's name he did so pursuant to her authorization in connection with the sale of the Estate Whim properties. He also acknowledged, however, that she had never conferred such authority on him in writing. Thus even if his testimony were entirely creditable, formidable problems under the Virgin Islands Statute of Frauds would remain.[11]

There are, however, serious difficulties with his version. It is patent on the face of the questioned documents and confirmed in his testimony that in executing the signature "Antoinette Bennerson" he took steps to make the handwriting appear different from his own. Also, even if he

---

[10] A record kept, presumably, pursuant to 3 V.I.C. § 775.

[11] 28 V.I.C. § 241 provides:

 (a) Except for a lease for a term not exceeding one year, no estate or interest in real property, and no trust or power over or concerning real property, or in any manner relating thereto, can be created, granted, assigned, transferred, surrendered, or declared, otherwise than—

. . .

 (2) by a deed of conveyance or other instrument in writing, signed by the person creating, granting, assigning, transferring, surrendering, or declaring the same, *or by his lawful agent under written authority,* and executed with such formalities as are required by law.

(Emphasis added.)

24

had been authorized to sign Mrs. Bennerson's name to deeds in order to make conveyances, he has offered no explanation for the use of her name, signed by him, as a witness on Exhibits P. 5 and P. 7. In both of these deeds he appears as grantor of parts of Plot 63. He claims that he had legal title to the entire Plot 63 by virtue of Exhibit P. 4, on which he signed her name, allegedly with her authority. It is one thing to suggest that he had authority to facilitate conveyances by an aged and infirm grantor. It is quite another to suggest that he was authorized to sign her name as a witness to deeds conveying title to land in which she allegedly had no legal interest. Added to this is his testimony as to the manner in which the sales of the parcels were conducted. All of the purchasers dealt with Joseph, and all but one paid the purchase price to him in cash. One check, delivered to him in connection with the sale to Mildred Senthill of Lot 107-J, was made out to Antoinette Bennerson. He signed her name on the back of it and cashed it. (Tr. 425; Exhibit D-R.) He testified that the proceeds were turned over to her. But aside from his completely uncorroborated statement, there is no evidence that she ever received any of the money he accepted for the conveyances. She, of course, denied such receipt. Finally, there is his testimony that on several occasions when disputes arose with the buyers he refunded the purchase price *out of his own funds*. (Tr. 402, 410–12; 422.) That action was hardly consistent with his claim that he was acting solely on Mrs. Bennerson's behalf and had turned the proceeds of the land transactions over to her.

█ Despite the inherent improbability of Joseph's testimony, the Master credited it, finding:

1. In 1968, Plaintiff Antoinetta [sic] Bennerson appointed Henry Joseph as her agent to sell her land in Plots 95 and 107 of Estate Whim;
2. The agency so established included the power to sign Mrs. Bennerson's name to deeds for lots in Plots 95 and 107;

25

3. In 1968, Henry Joseph took title to Plot 63 of Estate Whim in trust for Plaintiff, Antoinetta Bennerson; Mrs. Bennerson made a valid gift of Plots 95D and E to Henry Joseph.

The Master made no finding that Joseph's agency included the receipt of the purchase price. He did find:

10. Henry Joseph has probably turned over to Plaintiff Bennerson all the moneys he received for the sale of lots or other transactions relating to Plot 63, 95 and 107.

In all matters properly submitted to a master, his findings of fact must be accepted unless clearly erroneous. Fed. R. Civ. P. 53(e)(2); 5 V.I.C. App. I, R. 53(e)(2). Examining the entire record in this case, we might well conclude that some, at least, of the findings are clearly erroneous. But, because we think no master should have been appointed, and because a remand is required in any event, we will not engage in a detailed factual analysis of Joseph's testimony and that of other witnesses.

An explanation for the reference in finding No. 3 above to the trust status of Plot 63 is, however, in order. Exhibit P. 24, a document dated February 29, 1968, signed by Joseph and witnessed by Mrs. Bennerson's former attorney, reads:

STATEMENT OF TRUST

In consideration of the deeding by Antoinetta Bennerson of title to the undersigned, Henry Joseph, of Plot 63 of Unit 6 The Whim Estates, St-Croix, V.I. the undersigned hereby agrees that he is holding title to said plot in trust for said Antoinetta Bennerson during her lifetime and that he will pay over to her the net profits from said property as long as she shall live.

There is no testimony by any witness concerning the circumstances surrounding execution of Exhibit P. 24, its intended meaning, or its relationship to Exhibit P. 4, dated March 8, 1968, by which Joseph, signing Mrs. Bennerson's name, purported to convey Plot 63 to himself. Joseph contended that P. 4 evidenced an outright gift. He also testified that the conveyance of Plot 63 occurred because in

26

1963 he told Mrs. Bennerson he could remodel a stone house on the Plot, but was told by a bank officer that she was too old to get a bank loan to obtain the necessary financing. She then said, according to Joseph:

Well . . . [s]ince I can't get the money, you go ahead, I give you the land and you go ahead and get the house remodeled.

(Tr. 356.) The Master discredited Joseph's version that an outright gift was intended. He concluded that Joseph held Plot 63 in trust and had breached his fiduciary duties with respect to that Plot by placing a mortgage on it and by failing to account. He also made the following conclusions of law:

1. The deeds delivered to the individual Defendants for lots in Plots 95 and 107 of Estate Whim were not forged deeds;

2. The individual Defendants have good and valid title to their lots in Plot 95 and 107 of Estate Whim as against Plaintiff or anyone claiming through Plaintiff;

3. Defendants Ephraim, Petrus and Bates have good and valid title to their lots in Plot 63 of Estate Whim as against Plaintiff or anyone claiming through her;

4. The trust attached to the Deed of Plot 63 to Henry Joseph has now terminated and Henry Joseph, as trustee, is not entitled to any compensation or reimbursement of expenses from Mrs. Bennerson;

5. Henry Joseph must upon proper conditions transfer and convey to Plaintiff his entire interest in his lots in Plot 63 of Estate Whim;

6. Upon such reconveyance, Mrs. Bennerson should assume an obligation for payment of principal and interest under the combined mortgage on Plots 63 and on Plots 95D and E held by Henry Joseph, in the proportion that the value of the Plot 63 lots so conveyed to Plaintiff, bears to the combined value of such lots and improvements and of the Plots 95D and E lots and improvements owned by Henry Joseph.

In effect, the Master proposed a judgment in favor of ten defendants who never appeared in the action and in favor of two defendants who (so far as the record discloses)

27

never were served, as well as a judgment in favor of those defendants who did appear. With respect to Joseph's duty to account, the report is equivocal but probably is meant to decide that his sole obligation is to reconvey the unsold parts of Plot 63.

The district court, reviewing the Master's report, concurred in his findings of fact. The court, however, unlike the Master, recognized that, since the record established unequivocally the absence of any written authorization for the deeds signed by Joseph, the Statute of Frauds precluded the results suggested in the Master's report unless some bar to its application could be found. 28 V.I.C. § 241 requires that an agent's authority to sign a deed be in writing.[12] The court held, however, that the record established that Antoinette Bennerson was estopped from pleading the Statute of Frauds because she had represented Joseph to be her "man of business."

 The Restatement (Second) of Agency has been adopted as the common law of the Virgin Islands. 1 V.I.C. § 4. For guidance on the question whether a landowner may be estopped from relying upon the Statute of Frauds two sections are relevant. The first is § 8B.[13] The text of

---

[12] See note 11 supra.

[13] Restatement (Second) of Agency § 8B:

ESTOPPEL—CHANGE OF POSITION

(1) A person who is not otherwise liable as a party to a transaction purported to be done on his account, is nevertheless subject to liability to persons who have changed their positions because of their belief that the transaction was entered into by or for him, if

 (a) he intentionally or carelessly caused such belief, or

 (b) knowing of such belief and that others might change their positions because of it, he did not take reasonable steps to notify them of the facts.

(2) An owner of property who represents to third persons that another is the owner of the property or who permits the other so to represent, or who realizes that third persons believe that another is the owner of the property, and that he could easily inform the third persons of the facts, is subject to the loss of the property if the other disposes of it to third persons who, in ignorance of the facts, purchase the property or otherwise change their position with reference to it.

(3) Change of position, as the phrase is used in the restatement of this subject, indicates payment of money, expenditure of labor, suffering a loss or subjection to legal liability.

28

and comments to that section suggest that a principal can be estopped from asserting an agent's lack of written authority:

In the field of agency, a principal may incur liability by representing that one who has no authority to do an act or to make a contract for him has such authority. This is the typical situation in which ordinarily there is apparent authority and not merely estoppel. The lack of authority may result from the fact that the principal did not consent or the fact that required formalities were not observed.

### Restatement (Second) of Agency § 8B, Comment b.

Thus, the owner of land who learns that another believes himself to be the owner and because of that belief is making improvements on it, may be required to surrender the land or to pay for the improvements. See the Restatement of Restitution, §§ 40 and 53. So also one who knows that another is purporting to sell his property may be barred from recovery from a bona fide purchaser of it. See Restatement of Torts, § 894 (2).

Restatement (Second) of Agency § 8B, Comment c. But the general principles of § 8B must be read in light of the more specific treatment in § 52 of authority of agents to buy or sell.[14]

Comment b to § 52 provides:

Unless otherwise agreed, authority to act in the principal's business does not include authority to sell the principal's interests in land, unless the business entrusted to the agent includes the selling of land.

An agent's authority to sell land, in other words, is not easily inferred. It is certainly questionable whether a general reference to Joseph as "my man of business" would alone suffice to meet the § 52 standard for authority to sell land. Moreover § 52 is not an exception to the Statute of

---

[14] Restatement (Second) of Agency § 52:

Unless otherwise agreed, authority to buy property for the principal or to sell his property is inferred from authority to conduct transactions for the principal, if such purchase or sale is incidental to such transactions, usually accompanies them, or is reasonably necessary in accomplishing them.

Frauds. It is merely a rule of construction of a grant of authority which otherwise meets required formalities. Thus, even if the reference to "my man of business" were to be construed as a grant of authority to sell land, sign deeds, and receive the proceeds of sale, the Statute of Frauds still would apply. Its effect can be avoided only on the estoppel principles announced in § 8B.

██ The district court found such an estoppel in favor of all purchasers and entered the judgment which the Master proposed. The difficulty with the court's approach, however, is that an estoppel against the assertion of the Statute of Frauds with respect to any particular conveyance must in some manner be individualized with respect to the grantee claiming the benefit of the estoppel. Most of the grantees in whose favor judgment has been entered never even appeared in the action, and only a few of them testified. Of those who testified, only two or three had any dealings with Mrs. Bennerson, and none of these testified that anything she told them was communicated to other purchasers. The rights of remote grantees such as Soto or of mortgagees such as the First Pennsylvania Bank, N.A., depends entirely upon the circumstances giving rise to an estoppel in favor of the immediate grantees. The Master made no findings of fact with respect to circumstances giving rise to an estoppel in all the individual cases. On the record before him it was not possible to do so, since there was no testimony about many of them. In some cases— Joseph's claimed ownership of Plot 63, for example—such findings might have been possible but were not made. The district court, deciding the case on an entirely different theory than that relied upon by the Master, made estoppel findings which the Master had not made. Even in instances where the record evidence was sufficient with respect to specific transactions, that course was improper, because the heart of the case was the credibility of witnesses who gave

sharply divergent testimony. The district judge, functioning in a reviewing capacity, could not make the individualized findings which the Master who heard the testimony had not made. Thus the judgment appealed from cannot stand. A new trial is required.

■ Since we must remand for a new trial, it is appropriate to point out that the district court erred when it referred this action to a master. Rule 53(b), Fed. R. Civ. P., provides:

A reference to a master shall be the exception and not the rule. . . . [I]n actions to be tried without a jury, save in matters of account and of difficult computation of damages, a reference shall be made only upon a showing that some exceptional condition requires it.

The Supreme Court, interpreting Rule 53(b) in LaBuy v. Howes Leather Co., 352 U.S. 249, 256 (1957), said:

The use of masters is "to aid judges in the performance of specific judicial duties, as they arise in the progress of a cause," Ex parte Peterson, 253 U.S. 300, 312 (1920), and not to displace the court.

In that case, it authorized the use of a supervisory writ of mandamus to prevent reference of two complicated civil antitrust cases to a master for hearings and the preparation of findings of a fact and conclusions of law. After LaBuy, this is an a fortiori case. The hearings before the master took only three days of testimony and produced a transcript of only 444 pages. The hearing was devoted almost exclusively to issues of credibility. The one thing that might have justified use of a master—an accounting—was not accomplished. Indeed, since Joseph, the only party from whom an accounting was sought, was already in default when the order of reference was made, it was clear from the outset that the hearing in this non-jury trial would be devoted to simple factual matters turning on credibility. There were no exceptional circumstances warranting the delegation to a master of the task of resolving those issues.

31

██ Mrs. Bennerson does not on appeal advance as a ground for reversal the reference to a master, and we do not predicate our reversal on that ground. We do, however, in the exercise of our supervisory powers over the District Court of the Virgin Islands, direct that the case on remand be tried before the district court. That court must resolve the serious factual disputes upon which any application of estoppel must depend, and should make findings of fact with respect to the separate transactions involved, explicitly stating upon whom it places the burden of persuasion. The master, while finding that Joseph was a fiduciary, appears to have placed the burden of persuasion upon the beneficiary. This was manifestly wrong.

The judgment appealed from will be vacated and the case remanded for a new trial.