905 F.2d 1528
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Ronald V. APRAHAMIAN, Plaintiff-Appellee,
v.
Ronald L. HOLDEN; Linda Holden, Defendants-Appellants,
and
Andover Group Partnership, Defendant.
Ronald V. APRAHAMIAN, Plaintiff-Appellant,
v.
Ronald L. HOLDEN; Linda Holden, Defendants-Appellees,
and
Andover Group Partnership, Defendant.
Ronald V. APRAHAMIAN, Plaintiff-Appellee,
v.
Ronald L. HOLDEN; Linda Holden, Defendants-Appellants.
 Nos. 89-1433, 89-1438 and 89-1466.
 United States Court of Appeals, Fourth Circuit.
 Argued Jan. 9, 1990.
Decided May 21, 1990.
As Amended July 2, 1990.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, District Judge. (CA-88-1498-A, 87-1348-A).
 David Clifton Schroeder, Murphy, McGettigan & West, P.C., Alexandria, Va. (Argued), for appellants; Gregory L. Murphy, Cecily V. Schulz, Murphy, McGettigan & West, P.C., Alexandria, Va., on brief.
 William Ralph Chambers, Thomas Bruce Newell, Watt, Tieder, Killian & Hoffar, McLean, Virginia (Argued), for appellee; White & Case, Washington, D.C., on brief.
 D.Md.
 AFFIRMED AND REMANDED.
 Before PHILLIPS, MURNAGHAN and WILKINSON, Circuit Judges.
 PER CURIAM:
 
 
 1
 In the case we are asked to decide many issues arising from the dissolution of a Partnership formed between Ronald L. Holden and Ronald V. Aprahamian. We hold that the district court properly determined both the amount of and the entitlement to the Partnership assets. We also affirm the district court's grant of summary judgment for Aprahamian on the issue of Holden's default on various notes.
 
 I.
 
 2
 Ronald L. Holden and Ronald V. Aprahamian, in order to facilitate investing, formed a partnership, The Andover Group, effective as of July 16, 1988. Andover traded predominantly in the stock of HBO & Co., a company providing computer services to the health care industry. Holden, provider of the expertise in market and investment banking, was assigned a 25% interest in the Andover partnership. Aprahamian, who provided the money, held a 75% interest. From the outset, it was agreed that Aprahamian would indemnify and hold harmless Holden and Andover for any liability incurred from funds obtained through margin debt.[1] Aprahamian personally purchased the first HBO stock acquired by Andover, 1,175,000 shares at a cost of $5,810,625. Aprahamian sold Holden a one-fourth interest in those shares. Holden did not pay cash but provided Aprahamian with a promissory note, guaranteed by his wife, Linda Holden. Aprahamian and Holden then contributed each of their interests to Andover.
 
 
 3
 By June of 1987, Andover had purchased on margin 2,026,000 shares of HBO. Each time the Partnership made a purchase of stock, Aprahamian provided the cash and credit necessary and Holden issued to Aprahamian a promissory note for one-fourth of the purchase price of the stock. As a result Holden issued to Aprahamian six promissory notes totaling $5,401,794.25. Each note contained a clause specifying it "shall be governed by and construed under and in accordance with the laws of Virginia...."
 
 
 4
 The six notes, their respective due dates and amounts are set out below:
 
 
 5
 Date of Note Principal Amount of Note Due Date
July 29, 1986 $ 2,843,907.50 7/29/88
September 30, 1986 $ 355,956.25 9/30/88
November 24, 1986 $ 646,640.50 11/24/88
December 15, 1986 $ 60,015.00 12/15/88
January 30, 1987 $ 139,025.00 1/30/89
May 28, 1987 $ 1,356,250.00 5/28/89
Total $ 5,401,794.25
 
 
 6
 During the relevant periods, the parties executed a series of security agreements. On May 28, 1987, Holden as debtor and Aprahamian as secured party executed a final and inclusive Security Agreement and Financing Statement which secured all the notes. The agreement explicitly covered
 
 
 7
 [a]ll of the Debtor's rights as a partner under the Partnership Agreement dated effective as of July 16, 1986, of Andover Group, a Virginia general partnership (the "Partnership") (including, without limitation, all of Debtor's rights to distributions from the Partnership of (i) income, revenues, distributions, issues and profits, whether cash or otherwise, and (ii) capital contributions and assets upon dissolution of the Partnership).
 
 
 8
 The agreement further provided that in the event of the dissolution of Andover, Holden's shares of HBO became subject to the security agreement. The security agreement incorporated by reference all of the notes. In the event of default under any of the notes, Aprahamian as secured party was entitled to exercise any rights provided by the Michigan UCC as well as any rights or remedies provided in the notes themselves. Each of the notes contained an acceleration clause providing that, in the event of a default, the entire principal as well as all accrued and unpaid interest became immediately due and payable. Each note also provided a 10% late charge in the event the principal was not paid when due and required Holden to pay reasonable collection costs, including attorney's fees.
 
 
 9
 In addition, the parties executed an amendment to the notes on April 6, 1987. That agreement provided that 25% of any consideration Andover received for sale of any HBO stock was to be credited to Aprahamian with Holden's account debited accordingly. Upon receipt of those proceeds, the amendment required that Aprahamian "shall credit such payment to the notes then outstanding apply to oldest note 1st."
 
 
 10
 The Andover Group continued to deal in HBO stock. In the spring of 1987 Andover engaged in a proxy contest with HBO seeking replacement of the existing management and endeavoring to force HBO to seek a buyer for the company. A settlement of the proxy fight, reached on June 15, 1987, required HBO to pay Andover $1,000,000. Andover agreed not to acquire more HBO stock for a short period.
 
 
 11
 Between October 16 and 26, 1987, HBO stock dropped precipitously resulting in over four million dollars worth of margin calls to the Andover Partnership. (
 
 
 
 [2]
 As Aprahamian was contractually obligated to indemnify Andover for the margin losses, he needed a great deal of money quickly. Consequently, Andover made a deal with HBO.
 
 
 
 12
 On October 27, 1987, HBO paid Andover $9,660,000 for 1,500,000 shares of stock, partnership rights and an agreement that Andover would vote with HBO management for two years. At the market price on the transaction date, the cost of the stock traded, at a per share price, would have worked out to a price of $7,125,000. Contemporaneously with that October 27, 1987, sale, Holden and Aprahamian executed an agreement dissolving the Andover Partnership. The dissolution agreement provided that, with the addition of 19,500 shares, the proceeds from the 1,500,000 shares sold to HBO represented Aprahamian's interest in Andover. Holden would continue as the sole partner with any remaining shares being Partnership assets.
 
 
 13
 The sale to HBO of the 1,500,000 shares provided slightly more than enough income to satisfy all of Aprahamian's obligations to indemnify Andover for any liability as the result of buying the stock on margin. After indemnifying Andover, $237,000 remained from the sale of the stock. In the days after the dissolution of the Partnership, Aprahamian attempted to obtain from the account Andover had with the brokerage firm of Goldman Sachs, his remaining 19,500 shares of stock as well as the $237,000 in additional proceeds. He also attempted to remargin the 506,000 shares of HBO stock remaining in the Partnership account. Holden frustrated the attempts. Relying on the termination of the Partnership, Holden instructed Goldman Sachs not to permit Aprahamian to deal with the Andover account. On November 6, 1987, the Holdens executed an amendment to the Partnership Agreement making Linda Holden a 50% owner of the Andover partnership. Also on November 6, 1987, Aprahamian declared all six notes to be in default and sought to accelerate payment with interest and late charges. He filed suit on December 23, 1987, to that effect.
 
 
 14
 The Holdens counterclaimed, alleging that Aprahamian had breached the partnership agreement, that the notes, guaranty, and security agreement were void as contracts made in violation of Regulation G of the Securities and Exchange Act of 1934, 12 C.F.R. Secs. 207.1(b), 207.3(a)(b) (1989), that Aprahamian had secured Holden's signature on the October 27 agreement with HBO through fraud, and that the indemnification agreements required Aprahamian to pay both Andover's and Holden's legal fees and expenses.
 
 
 15
 The matter was tried before the district court without a jury. At the trial both Holden and Aprahamian testified to the amounts each believed they were due. Holden claimed that the difference between the price paid by HBO for the 1,500,000 shares of stock on October 27, 1987, and the price at which the stock was actually trading constituted a payment to Andover for the rights it surrendered to HBO. As such Holden claimed that that difference in price was a Partnership asset to which he was entitled to twenty-five percent.
 
 
 16
 On August 13, 1988, the district court ruled that the notes were not yet in default, but that Aprahamian was entitled to an accounting of his Partnership interest as of October 27, 1987. The court instructed counsel for the parties to inform the court if they could agree on the assets or if a formal accounting was necessary. In addition, the trial court entered judgment for Aprahamian on all of the Holdens' counterclaims.
 
 
 17
 The accounting issues remained unresolved; each party submitted to the court several documents and memoranda. On February 15, 1989, the Holdens moved the district court for appointment of a special master to resolve the accounting issues. After a hearing and consideration of the submissions, the district court, without appointing a master, awarded Aprahamian $284,918.93 as his share of the Partnership as of October 27, 1987. The Holdens appealed.
 
 
 18
 In addition to the parties' disagreement over the accounting issues, Aprahamian continued to demand repayment of the notes. While not in default when the district court entered its order on August 15, 1988, the third note remained unpaid past its due date. Consequently, on November 29, 1988, Aprahamian again filed suit seeking recovery under the third note and a declaratory judgment that he was entitled to all assets of Andover pursuant to the terms of the Security Agreement.
 
 
 19
 On February 27, 1989, after a two day hearing, the district court granted Aprahamian's motion for summary judgment and awarded him, through acceleration, all outstanding balances on the four remaining notes because of Holden's default on the third note. At the time of the judgment, due dates on all but the last note had passed. The district court accelerated by three months the payment on that sixth note. The Holdens again appealed. Aprahamian appealed the district court's refusal to award late fees on the sixth note.
 
 II.
 
 20
 The Holdens claim that the district court erred in its accounting assessment and that there exist genuine issues of fact precluding the grant of summary judgment.[3] The Holdens quarrel with the district court's accounting because the court (1) failed to appoint a master and (2) failed to order a formal accounting and apply what the Holdens consider to be the relevant factors.
 
 
 21
 We note first that Fed.R.Civ.P. 53(b) states that "reference to a master shall be the exception and not the rule." Reference to a special master is unnecessary except upon a showing of exceptional circumstances. Bennersen v. Joseph, 583 F.2d 633, 642 (3d Cir.1978). We do not find those circumstances present here. The district judge did not abuse his discretion in failing to appoint a master.
 
 
 22
 The Holdens contend that they have a right to a formal accounting. The Andover Partnership agreement does provide that upon the withdrawal of a partner an accounting shall be made. The agreement, however, does not make any specific requirements for such an accounting. The district court's evaluation serves as an accounting and thus satisfies both the terms of the partnership agreement as well as the dictates of Virginia law. Va.Code Ann. Sec. 50-22 (1986 Repl.Vol.).
 
 
 23
 Essentially, the only accounting determination which the Holdens allege as error is the district court's valuation of the premium price paid by HBO for the 1,500,000 shares of its stock. The Holdens allege that the assets should be valued at fair market value determined by appraisal and then allocated among the parties according to their partnership interests. By that reasoning the Holdens claim that they are thus entitled to 25% of the premium price.
 
 
 24
 The issue of the valuation of the "premium price" only becomes relevant if the value attributed to shareholder rights that Andover forfeited when HBO bought back the stock are indeed Partnership assets. In its April 28, 1989, order, the court refused to allocate to the Holdens any interest in this premium price:
 
 
 25
 Defendants also contend they should receive the premium from the sale of the large block of stock resulting from the margin call. This issue was raised at trial and has been addressed in the Findings of Fact and Conclusions of Law.
 
 
 26
 The Holdens protest that the district court's findings of fact made no mention of how the proceeds should be divided. It is true that the district court did not explicitly mention the premium price in the Findings of Fact and Conclusions of Law. Nevertheless, Ron Holden did assert a claim to these proceeds at trial, in his direct testimony concerning his counterclaims.[4] The court entered judgment for Aprahamian on all the counterclaims, though without singling out the particular claim to these proceeds. However, in the order quoted above, the court did specifically refer to its disposition of the claim.
 
 
 27
 Though the language used by the district court is somewhat cursive, it nevertheless serves to decide the issue. We find no need to disturb the holding. The Holdens have attacked the court's accounting without addressing the underlying issue of entitlement. They have consequently presented no basis for overruling the district court's decision.
 
 
 28
 We have also examined the district court's accounting. Aprahamian insists our review is of the district court's findings of fact and as such he urges a clearly erroneous standard. Fed.R.Civ.P. 52(a). London v. Troitino Brothers, Inc., 301 F.2d 116 (4th Cir.1962) (review of masters' findings of fact in an accounting if accepted by the court shall not be set aside unless clearly erroneous). Holden argues that the district court's ruling on the accounting without the aid of a master was more in the nature of a summary judgment and hence urges a de novo review. Higgins v. E.I. DuPont De Nemours & Co., 863 F.2d 1162, 1166-67 (4th Cir.1988).
 
 
 29
 We agree that accounting issues are factual determinations. We do not find the district court's evaluation to be clearly erroneous and affirm. Anderson v. City of Bessemer City, 470 U.S. 564, 572-73 (1985).
 
 III.
 
 30
 The Holdens rely on the supposed existence of genuine issues of fact to preclude the grant of summary judgment requiring acceleration of the notes. They attempt to emphasize disputes, in particular supposed attempts at tender as well as issues of estoppel, but do not support the relevancy of the disputed facts. The documents clearly show debts due. The terms of the notes call for acceleration of all upon default of one, with payments to be applied "to oldest Note first." Those facts are not in dispute and warrant summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).
 
 
 31
 The district judge's award to Aprahamian followed from the grant of the motion for summary judgment. The summary judgment was entered on February 27, 1989, at a time when Notes three, four, and five were unmistakably late. Late fees on those Notes have properly been allowed. The sixth note was not due, except for the acceleration provision, until three months after the grant of summary judgment. Judge Hilton did not award a late fee for Note Six, which was "late" only by virtue of the acceleration provision.
 
 
 32
 Aprahamian argues that he is entitled to a late fee on the sixth note because "such fees are recoverable on the Sixth Note and should have been awarded below." We do not find such an assertion, without reference to any authority whatsoever, persuasive. Similarly, however, the Holdens point us to no authority in support of their opposition to an award of a late fee on the sixth note.
 
 
 33
 As we have been unable to find any Michigan or Virginia law on the point, we independently conclude that the district judge correctly determined that the late payment on the sixth note is not due. While Aprahamian argues the default existed upon the filing of the complaint, we agree with the district court that the late fee should not apply to those notes not yet due, other than through acceleration. The late charge, by its terms, simply gives Aprahamian a remedy if payment is late. The acceleration clause permits him to accelerate the loan if any payment is not made when due. The late charge thus gives Aprahamian an alternative remedy should he elect not to accelerate. See Haynes v. Bank of Wedowee, 634 F.2d 266, 272 (5th Cir.1981) (late charge and acceleration clause not inconsistent, late charge alternative remedy if lender elects not to accelerate).
 
 
 34
 The judgment is, therefore, affirmed and the case remanded for calculation of the collection of costs added by virtue of the appeal.
 
 
 35
 AFFIRMED AND REMANDED.
 
 
 
 [1]
 For each purchase of HBO stock, Aprahamian funded a portion of the price and made his credit available to enable the stock to be purchased by Andover on margin. The Partnership maintained margin accounts pursuant to margin agreements with various brokerage companies. Under those agreements, the Partnership was entitled to maintain margins up to an amount equal to a certain percentage of the value of the stock purchased. If the price of the stock dropped, the maximum permitted borrowings also dropped. If the borrowing limits were exceeded, it was necessary for the Partnership to pay additional cash to reduce the borrowings to the maximum limit. If the Partnership could not make such a payment or margin call, the brokerage company was authorized to sell the stock and apply the proceeds to reduce the margin debt balance
 
 
 [2]
 The stock market crash on October 19, 1987, became known as "Black Monday."
 
 
 [3]
 The Holdens also appealed the district court's judgment that the notes were not voidable pursuant to Regulation G of the Securities and Exchange Act of 1934. The Holdens, however, have withdrawn that argument. Aprahamian moved the Court, pursuant to Fed.R.App.P. 38, for costs, damages, and fees incurred in responding to the Regulation G argument. We do not find the Holdens' Regulation G argument to be a frivolous one and accordingly deny appellee's Rule 38 motion
 The Holdens' motion to strike portions of Aprahamian's "Reply and Answering Brief" is also denied.
 
 
 [4]
 The following exchange took place during Holden's direct testimony:
 Q. There has been some talk of the premium that HBO paid for the million-and-a-half shares which were Mr. Aprahamian's shares. Is it your position that you are entitled to part of that premium?
 A. Yes, it is.
 Q. Why is that your position?
 A. When we sold the--The idea of selling the stock to HBO was that we would also, we would bundle the sale with certain rights that we would throw in, that's why they should pay us a premium as opposed to doing a public transaction.
 ... And we were paid a million-two over market, and I feel I am entitled to 25 percent of that.